W. S. VANN AND H. B. FRYAR ET AL. V. THE BOARD OF COMMISSIONERS OF SAMPSON COUNTY, THE BOARD OF EDUCATION OF SAID COUNTY, AND N. A. WILLIAMS, SHERIFF.

(Filed 21 March, 1923.)

**Schools—School Districts—Taxation—Special Tax—Enlargement of Districts—Elections—Majority Vote—Enlargement of Territory—Statutes.**

The uniting of an existing special school tax district with other districts not having such tax is in effect the enlarging of the boundaries of the tax district to take in outlying nontax territory under the provisions of C. S., 5530; and it is only required for the establishment of the enlarged district and the levying of a special tax therein, that the district to be enlarged and the outlying territory, should each cast a majority vote in favor of the propositions submitted to them, and it is unnecessary that each of the nontax districts included in the enlarged territory should have separately cast a majority vote in favor of the special tax proposed, nor is it material that one of them was separated from the others by the original special tax district so enlarged. The importance of education upon the mental and moral conditions of the people in relation to self-government, commented upon by WALKER, J.

APPEAL by plaintiffs Vann and Fryar from order of *Cranmer, J.,* 12 September, 1922, from SAMPSON.

WALKER, J., stating the case: This is a civil action by the plaintiffs, W. S. Vann, H. B. Fryar, and others, against the board of commissioners of Sampson County, the board of education of Sampson County, and their respective members, and N. A. Williams, sheriff of Sampson County, to enjoin and restrain the collection of certain taxes, levied for school purposes, in a proposed enlarged or consolidated school district, comprising Ingold Special Tax District (which prior to the proposed consolidation had been levying for school purposes a tax of 30 cents on the $100 valuation of property and 90 cents on the poll), and Parker, Eureka, and Clear Run school districts, the latter three being nonlocal tax districts.

In May, 1921, the citizens of Ingold and Clear Run districts started a movement to consolidate the four districts mentioned above into one district, which included all the school districts in Lisbon Township, with the exception of Garland Special School District. They secured to a petition the names of the requisite number of voters, from Ingold and Clear Run districts, calling for an election in the entire territory, and their action being approved by the board of education of Sampson County, the board of commissioners of that county accordingly called an election to be held on 14 June, 1921, to vote upon the consolidation of the four districts, or rather the enlargement of Ingold District under C. S.,

VANN v. COMBS.

5530, and to decide upon the question whether or not they should levy a tax of 30 cents on the $100 valuation of property and 90 cents on the poll in the three districts not heretofore having a special tax.

In said election all the voters in the four respective school districts were allowed to vote together upon the proposition submitted to them, the said election being held at Ingold, in the Ingold District, and all votes were placed in the same ballot box and were counted and tabulated together, and the result declared in the entire district as a unit, but it is not known how many votes for and against the question were cast in Ingold District and how many of such votes were cast in the outlying territory.

The Eureka District, a part of the new territory being taken in, was not contiguous to Parker and Clear Run districts, the same being separated from them by Ingold District. And in the election which was held, a majority of the voters in Eureka District voted against consolidation, and in Parker District no single voter signed the petition calling for an election, or voted for consolidation on the day of election.

The above are the facts so far as stated, but a more comprehensive and detailed statement was made by his Honor, Judge Cranmer, in his judgment, which was as follows:

This cause coming on for hearing before his Honor, E. H. Cranmer, judge, and being heard upon the notice to defendants to show cause why the temporary restraining order heretofore granted in this cause should not be continued to the final hearing; from the pleadings and affidavits filed herein the court finds the following facts, to wit:

1. That on the first Monday in May, 1921, a petition duly signed by one-fourth of the freeholders in a certain territory described in said petition as follows: "All of Lisbon Township, Sampson County, except the Garland Special Tax School District," which petition having been endorsed by the board of education of Sampson County, was filed before the board of education of Sampson; said freeholders praying in said petition that an election be ordered in said territory to ascertain the will of the voters therein as to whether there should be levied a special tax of not more than 30 cents on each $100 worth of property, and 90 cents on the taxable poll, to supplement the school funds, which may be apportioned by the board of education to said district in accordance with the provisions of law. Said petition, as copied on the minutes of the board of commissioners of Sampson County, is hereby referred to and made a part of this finding.

2. The territory described in the petition embraced the Ingold Special Tax District created in 1903, in which a special tax of 30 cents on the $100 valuation of property and 90 cents on the poll was in force, as well

as the districts of Parker, Eureka, and Clear Run, which were nonlocal tax districts.

3. All of said districts embraced in said territory were contiguous to each other, though Eureka District did not join the other two nonlocal tax districts, being separated therefrom by Ingold Special Tax District.

4. That said election was held on 14 June, 1921, at Ingold, North Carolina, in said Ingold District, at which time and place all the qualified voters in said proposed district were allowed to vote on said proposition, but all voted together, without regard to district lines, and no separate election was held in either Parker, Eureka, or Clear Run districts, or in the three districts as a unit, separate and apart from the Ingold District.

5. That at said election there was registered within said territory 190 qualified voters, 87 of whom were residents of Ingold District and 103 outside of said Ingold District; that of the 87 possible votes of Ingold District, 86 were cast for the special tax; and of the 103 votes outside of said Ingold District 66 were cast for special tax; though in Parker District no vote was cast for said special tax, and in Eureka District a majority was cast against the special tax.

6. That all the votes were cast in the same box, and were counted and tabulated together, without regard to district lines or the location of the parties casting them, and the result was declared on the whole territory.

7. That the result of said election was certified to the board of commissioners of Sampson County, and the said board then ordered the said district established in accordance with the result of said election.

8. That since said election and order the board of education, together with the school committee appointed for said proposed district, have contracted for the erection of a school building in said proposed district at the cost of approximately $16,500, and the said board of education and school committee have obligated themselves for said amount, and the building is now nearing completion, the sum of $16,000 having already been expended on said building.

9. That a tax of 30 cents on the $100 valuation of property and 90 cents on the poll was levied and collected for the year 1921, and a like amount has been levied for the year 1922, but none of it has been collected at this time.

10. That this action was commenced on 1 September, 1922, for the purpose of having declared null and void the said election held in said proposed consolidated district, and the order establishing said district, and for the further purpose of prohibiting the commissioners of the county from the further levy of taxes, under the election in the district,

and to prohibit the sheriff of the county from the further collection of said taxes.

Whereupon it is considered, ordered, and adjudged by the court that the temporary injunction or restraining order heretofore issued in this cause be and the same is hereby dissolved. Let the costs be taxed against the plaintiffs and the surety on their bond.

E. H. CRANMER,
*Judge Presiding.*

To the foregoing judgment the plaintiffs, in open court, except and appeal to the Supreme Court; notice waived, and bond in the sum of $50 adjudged to be sufficient.

It is hereby agreed by counsel that the pleadings, the judgment, restraining order, and entry of appeal shall constitute the record in this case.                                    E. H. CRANMER,

*Judge.*

ASSIGNMENTS OF ERROR.

The plaintiffs, W. S. Vann and H. B. Fryar, appealing, assign errors as follows:

1. For that his Honor was in error in dissolving the injunction and restraining order, and in refusing to continue it until the final hearing, and this error is the basis of plaintiffs' first exception.

2. For that his Honor was in error in signing the judgment set out in the record, and this error is the basis of plaintiffs' second exception.

Respectfully submitted,

FAIRCLOTH & FISHER,
*Attorneys for Plaintiffs.*

The above statement, somewhat more elaborate than the brief one preceding it, will give us a better and more accurate conception of the whole case, including the questions raised by the respective parties.

*Faircloth & Fisher for plaintiffs.*
*H. E. Faison and Manning & Manning for defendants.*

WALKER, J., delivering the opinion of the Court: This is practically, and in a legal sense, a case of enlarging a school district, that is, Ingold District, and while the words "consolidating districts" may not inaptly be applied to the process adopted, it nevertheless, in substance and effect, eventuates in an extension or enlargement of the boundaries of Ingold District, by including therein contiguous territory. There has been an election to determine whether this shall be done, which resulted in a majority vote being cast in its favor, both in Ingold District and in the

rest of the outlying territory or districts. Some question has been made in opposition to this enlargement, or consolidation, by whatever name we may call it, upon the ground that a part of the outlying districts, or those other than Ingold District, that is to say, Eureka District, is not contiguous to Parker and Clear Run districts, but this is not material, in the view we take of the facts and the law of the case, as the statute does not require that there shall be separate elections in each school district of the outlying and contiguous territory proposed to be annexed to the old or tax-paying district, but only provides that an election in such new territory may be ordered and held, . . . and in case a majority of the qualified voters "in such new territory shall vote at the election in favor of a special tax of the same rate as that voted and levied in the special-tax district to which the territory is contiguous, then the new territory shall be added to and become a part of the special-tax district," etc. It will be seen, therefore, that the vote is required to be taken in the "new territory," whether it happens to be composed of only one or of several school districts, and it can make no difference, when there are several of them, that they are not all contiguous to each other. If the Legislature had intended that there should be a separate vote in each district, it was easy to so have expressed it. And, again, the fact that some of the voters failed to vote, or absented themselves from the polls, was their own fault, and does not invalidate the election, there having been a clear majority of the qualified voters in favor of the measure, both in the old district and also in the new territory, and, of course, there was also a clear majority of the voters for the measure in the combined districts. Therefore, questions raised and decided in *Reiger v. Comrs.,* 70 N. C., 319; *Norment v. Charlotte,* 85 N. C., 387, and several other cases which might be cited, are not involved in this litigation, our present purpose being accomplished, when we decide, as we do, that the election, according to the facts found by his Honor, Cranmer, J., was regularly held and conducted, and that the measure submitted to the people received a majority at the polls in the new and outlying territory.

Referring to the case of *Riddle v. Cumberland,* 180 N. C., 321, and considering it in connection with two more recent cases, *Hicks v. Comrs.,* 183 N. C., 403, and *Perry v. Comrs.,* 183 N. C., 387, we need only say that the latter two cases have already been so sufficiently distinguished from the *Riddle case, supra,* as to require no further or additional comment by us upon the distinction between those cases, which has been so clearly drawn, and fixed by the opinion of *Justice Stacy* in the *Perry case, supra.* The *Riddle case, supra,* on the one side, and the *Hicks* and *Perry cases, supra,* on the other, are so entirely unlike in their special facts and the principles applicable to them that we might safely have left the dissimilarity between them to appear from the results in the

several cases themselves without being further made to appear by the sharp discrimination which was stated and, by forceful argument, demonstrated in the *Perry case, supra.* We may add that the learned counsel for the plaintiffs in this case have virtually recognized that distinction, and accepted it as having been finally determined.

It is of the first and last importance that there should be a settled and uniform construction of our school laws. The education of the people, mentally and morally, under just and effective laws, rules, and regulations, constitute the very foundation upon which must rest the development and success of our social fabric, and the happiness and prosperity of the people, and our Constitution recognizes this, and in proof thereof I trust that I may be permitted to reproduce here what I stated in *Collie v. Comrs.,* 145 N. C., 170, at pp. 179-180: "In Article IX the very first declaration is that religion, morality, and knowledge lie at the very foundation of all good government. And who can doubt the correctness of this proposition? They are the essential prerequisites, if I may so speak. Without intelligence, properly cultivated and directed, good government would be almost impossible, especially where the particular form of State policy depends so largely upon the will of the people as it does in a representative democracy. I may go further and assert that this principle is applicable generally to all forms of society, and lies at the foundation of all human institutions. Good government begins at the fireside, is nourished in the schoolhouse, and gradually developed in the council chamber and legislative halls, on the hustings, and in the forum, and refined, purified, and ennobled by the holy precepts of religion and morality as taught and inculcated in the sanctuaries of the people. What the State needs to make her great and prosperous are good minds and good men. She is apt always to have the beneficent influence of good women in her homes. Education, religion, and morality must be the cornerstones of all successful government." *Collie v. Comrs.,* 145 N. C., 179-180. This being so, an essential means to the proper, ready, and uniform enforcement of our school laws is a correct understanding of their provisions, and their meaning to the end that there may be uniform administration of these laws throughout the State by those charged with the supervision and government of our schools. Any disagreement as to the proper construction and meaning of the law might be fatal to this "due and uniform enforcement"—and enlightened administration of our educational affairs, and perhaps, also, disastrous to the schools themselves. We have had some proof of this in the past, but under the settled rulings of this Court, and the wisdom of the Legislature, much of the difficulty of administration arising from disagreement, and discord, and correct interpretation of the law has disappeared, and in its stead a more progressive and effective educational system has been estab-

lished, though we may add that some of the supposed discrepancies in the construction of our school laws, resulting in doubt as to their proper administration, were more seeming than real. The law, as it has been declared by this Court in former decisions, appears, at this time, to be well understood, as we observe that the election now being considered has been held and conducted with greater regard for the right of the people to be heard upon the question of taxing themselves for schools than seemed formerly to be the case.

Our conclusion is that the election was properly held, and that a legal majority has voted in favor of the creation of the new districts, and also of the taxation which necessarily follows from it. The general result is that there being no error in the rulings and decision of Judge Cranmer, we must affirm his judgment.

Affirmed.